895 So.2d 729 (2005)
Rosario H. SEPULVADO, Plaintiff-Appellant,
v.
TIME IT LUBE, INC., Defendant-Appellee.
No. 39,353-CA.
Court of Appeal of Louisiana, Second Circuit.
March 2, 2005.
Rehearing Denied March 31, 2005.
James D. Caldwell, Tallulah, for Appellant.
Mark W. Odom, Shreveport, for Appellee.
Before WILLIAMS, CARAWAY and PEATROSS, JJ.
*730 WILLIAMS, J.
The plaintiff, Rosario Sepulvado, seeks review of an involuntary dismissal in favor of defendant, Time It Lube, Inc. For the following reasons, we affirm the trial court's judgment.

FACTS
In February 2002, Rosario Sepulvado ("Mrs. Sepulvado") filed a small claim in Shreveport City Court against Time It Lube seeking $2,345.75, plus interest and costs, based upon damage to her vehicle allegedly caused by the failure of a "substitute plug" that Time It Lube had installed in the vehicle's oil pan following an oil change in September 2001. Mrs. Sepulvado asserted in her handwritten statement of claim:
[T]he service man informed me that a substitute plug had been used. I was very unhappy because I feel I should have been told before instead of after. I expressed to him my concern about any problems because of the use of different plug. He assured me it [sic] there be no problem at all, that as a matter of fact, I did not need to replace the plug until the next oil change. I paid for the service and left.
Mrs. Sepulvado further asserted that on December 15, 2001, her husband was driving the vehicle when it stalled and would not restart. The vehicle was towed to a mechanic who found that the oil pan drain plug was missing, found that the engine apparently had "spun one or more bearings," and found a piece of what appeared to be a "backing plate" for some type of replacement oil pan plug in the oil pan.
At the trial of the matter, the first witness was Thomas Englade, the mechanic who examined the vehicle after it was towed to his shop, and who later repaired the vehicle by installing a new engine and associated parts. Englade was accepted by the court as an expert in general automotive repair, with the exception of transmissions. After explaining how the engine was damaged by losing oil, Englade was asked about the kind of "temporary oil pan plug" at issue. Englade explained that such a temporary plug was used when an oil pan plug was compromised in some way. According to Englade, the temporary plug would stop the flow of oil from the pan and allow the vehicle to be transported to a repair facility. He later explained that his shop had replaced several oil pans for local Wal-Mart Stores "when they strip out a pan," and that the stores would send the customers to his shop "usually within a week of any damage to the oil pan."
When asked how long one could leave a temporary plug in place, Englade responded that he did not know what the manufacturer of the plug advertised, or what the manufacturer said about the intended use or length of use. Englade further stated that when his shop had removed those kind of plugs, they usually tore apart upon the first removal. According to Englade, he would not leave such a plug in "for general driving around for any length of time." Furthermore, he stated that such a plug did not have the integrity of a solid plug, but was designed with "a rubber mating surface rather than a threaded machine surface to make sure the oil stays in the pan."
Englade then was asked about a situation in which a technician might advise the owner or driver of a vehicle that it would be okay to leave such a temporary plug in the vehicle until the next oil change; Englade responded:
Again ... I'm not sure I can answer that because I don't know what the manufacturer of that plug states [is] the intended use or or how it's intended to *731 be used ... we've never installed `em ourselves.
However, Englade stated that he would not give someone that advice, but would tell them to get the vehicle to a repair shop as quickly as possible.
Evidence at trial established that the owner's manual for the vehicle at issue recommended oil changes every 7,500 miles under ordinary driving conditions. However, Englade stated that his shop and other businesses, such as Time It Lube, recommended changing the oil every 3,000 miles, part of the reason being to generate more business. The invoice that Mrs. Sepulvado had received from Time It Lube recommended another oil change three months later or after an additional 3,000 miles. The Sepulvado vehicle was driven a little less than two weeks beyond the three-month recommended interval, and was driven a little more than 2,000 miles beyond the 3,000 mile recommended interval at the time the engine failed due to lack of oil. The owner's manual for the vehicle recommended an oil change every 3,000 miles under "severe driving conditions." Such conditions included repeated short distance driving, dusty conditions and severe conditions.
On cross examination, Englade admitted that it was fair to say from his experience that some force would have had to have been exerted on the plug to make it come off and allow the oil to run out. He also acknowledged that it would be "real speculation" whether the plug became loose first, or whether "something else broke loose in the engine." Englade responded affirmatively when asked if it was unlikely that the stem on the plug at issue would have broken after 5,000 miles if it had a defect the day the plug was installed, and he also responded "probably so" when asked if the oil would have leaked out "way before 5,000 miles" if the plug was not installed properly. On redirect, Englade agreed that the reason the plug came out was unknown and that the damage to the remaining piece left in the oil pan could have occurred before or after the oil had leaked out. He also agreed that vibration of the vehicle could have caused the plug to "spin loose." On re-cross examination, Englade admitted that he could not eliminate an external trauma as the cause of the oil plug failure.
The next witness to testify was Lee Sepulvado ("Mr. Sepulvado"), the husband of Rosario Sepulvado. Mr. Sepulvado was driving the vehicle when the engine failed, and he recounted the events surrounding the engine failure. He then indicated his familiarity with the oil change service schedule recommended in the owner's manual of every 7,500 miles or six months, whichever comes first. However, he admitted that he did not consider whether his driving might be construed by the manufacturer as "severe driving conditions" under which the oil should be changed every 3,000 miles. Mr. Sepulvado did not know what the manufacturer meant by "repeated short distance driving," but did state that he considered the kind of driving to which the vehicle was exposed to be "suburban" as opposed to "city driving."
The last witness was Mrs. Sepulvado. She testified that she was the primary driver of the vehicle at issue, that she changed the oil in the vehicle between 5,000 and 6,500 miles, and that she was aware from the owner's manual of the 7,500 mile recommendation on oil changes. She also indicated that the type of driving she normally did in the vehicle was a mix of long distance and short distance driving. Mrs. Sepulvado indicated that the employees at Time It Lube did not tell her why they could not use the original oil pan plug and did not show her the plug before *732 replacing it. She indicated that she expressed concern about using a substitute plug and asked why one was being used. She allegedly was told that they did not have the "original plug" in stock and that it would take "a couple of days" to get an original plug. She then testified that she told the employees that she could bring her car back in a couple of days, but they told her not to worry about it because the substitute plug would work until the next oil change. She indicated she had no reason to disbelieve this statement.
At the close of plaintiff's case in chief, the trial court granted the defense counsel's motion for an involuntary dismissal. This appeal followed.

DISCUSSION
The provisions of La. C.C.P. art. 1672(B) state:
In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all the evidence.
A motion for involuntary dismissal requires the judge to evaluate the evidence and render a decision based on a preponderance of the evidence, without any special inference in favor of the party opposing the motion. Silva v. Calk, 30,085 (La.App.2d Cir.12/10/97), 708 So.2d 418. An appellate court should not reverse an involuntary dismissal in the absence of manifest error; if the trial court's findings are reasonable in light of the record reviewed in its entirety, the appellate court may not reverse even though convinced that, had it been sitting as the trier of fact, it would have weighed the evidence differently. Davies v. Johnson Controls, Inc., 36,498 (La.App.2d Cir.10/23/02), 830 So.2d 462.
In the instant case, the correctness of the involuntary dismissal focuses on proof of causation for the plug's failure. Mrs. Sepulvado did not put on any evidence to show why the original oil pan plug needed to be replaced, and the evidence submitted failed to show the cause of the replacement plug's failure. The evidence does indicate that the failure likely was sudden, and the evidence also indicates that, more likely than not, the failure was not due to improper installation of the plug, given the length of time the plug worked before failing. Accordingly, we are left with the possibility that the plug could have failed because it was defective, the possibility that the plug could have failed because it was not designed to be used in the manner or for the length of time it was used, and the possibility that the plug failed due to some type of trauma such as being struck by a rock or other object on the roadway. If the trial court had found that a preponderance of the evidence favored the first or second possibility, then the trial court undoubtedly would not have granted the involuntary dismissal. Because the involuntary dismissal was granted, the trial court obviously found that no such preponderance existed, and that there was a failure to prove causation attributable to Time It Lube. Reviewing the evidence submitted, and giving the trial court's decision the proper deference, we do not find the trial court's decision to be clearly wrong. Put another way, we detect no manifest error in the trial court's conclusion that Mrs. Sepulvado failed to carry her burden with respect *733 to causation. Accordingly, we will not disturb the trial court's judgment.
For the reasons set forth above, the trial court's judgment is hereby affirmed at appellant's costs.
AFFIRMED.
CARAWAY, J., dissents with written reasons.
CARAWAY, J., dissenting.
I respectfully dissent.
The first reason both the trial court and the majority improperly reject plaintiff's case is because they never cite the correct law with which to define the legal issue and adjudicate the claim. The only oral reason given by the trial court for its ruling was because of a lack of evidence that Time-It did not perform "in a workmanlike manner." Citing no substantive law whatsoever, the majority opinion rests upon a conclusion about causation that the plug failed due to some type of random trauma to the plug. Yet, it can easily be conceded that Time-It changed the oil in a workmanlike manner, the temporary plug held back the oil, and a random rock probably struck the temporary plug later causing its sudden failure. That said, when the case is viewed under the correct legal standard, plaintiff clearly established nevertheless that Time-It breached a contractual obligation imposed by law.
In this case, there were two separate aspects of the parties' contractual relationship. Time-It effectively (i) contracted its services to the plaintiff, and (ii) conveyed to her the temporary oil plug device. This dispute relates to the fitness of the temporary device delivered to the plaintiff. The implied warranty of fitness pursuant to Civil Code Article 2475 has been recognized by this court for parts conveyed under automotive repair contracts. Diamond v. Interstate Dodge, Inc., 35,137 (La.App.2d Cir.9/26/01), 796 So.2d 701. Additionally, the following two articles of our law of sale are applicable to measure the breach of contract which the plaintiff asserts:
La. C.C. art. 2524  The thing sold must be reasonably fit for its ordinary use.
When the seller has reason to know the particular use the buyer intends for the thing, or the buyer's particular purpose for buying the thing, and that the buyer is relying on the seller's skill or judgment in selecting it, the thing sold must be fit for the buyer's intended use or for his particular purpose.
If the thing is not so fit, the buyer's rights are governed by the general rules of conventional obligations.
La. C.C. art. 2529  When the thing the seller has delivered, though in itself free from redhibitory defects, is not of the kind or quality specified in the contract or represented by the seller, the rights of the buyer are governed by other rules of sale and conventional obligations.
Under these articles, the plaintiff claims that she relied upon Time-It's judgment in selecting the temporary device conveyed to her as part of the contract, and that the device was not fit for her use until her next oil change, as represented by Time-It's technician. The fact that the temporary plug device was not defective upon its installment and served to contain the oil for 5,000 miles is not dispositive. Instead, the question is how long could the fitness of the temporary device be expected to hold up?
Articles 2524 and 2529 address the contractual obligation of fitness of the thing delivered which is distinguished from a redhibitory defect. See, Revision Comments, La. C.C. arts. 2524 and 2529. There was no redhibitory defect in the *734 temporary plug. When it was delivered to the plaintiff, it temporarily held the oil in the oil pan so in that sense a "redhibitory defect" did not cause the failure. Nevertheless, the dispute is over the extent of the temporary use or fitness of the product available to plaintiff as represented by Time-It. When the correct law is applied, the legal issue is whether the warranty of fitness of the device measured up to the same fitness the originally equipped oil plug had exhibited and would last without sudden failure until the next oil change. In this regard, plaintiff's automotive expert gave the opinion that the temporary plug should not have been used in the vehicle until its next regular oil change, whenever such oil change occurred. Tacitly recognizing both the application of the warranty of fitness and the temporary and flimsy integrity of the plug, Time-It's counsel argued a Russian roulette defense to the trial court that after 3000 miles "all bets were off" regarding the reliability of the device. Mrs. Sepulvado was never told that.
The second problem with the majority opinion is that it does not examine the actual physical evidence which plaintiff introduced. The best evidence in the case is the remaining piece of the temporary plug which was found by Englade in the oil pan. That piece, when examined in comparison with an exemplar of the temporary plug, also in evidence, and the factory standard oil plug which was removed by Time-It, is the essential proof of plaintiff's case.
In his expert testimony, Englade identified the specific device Time-It used for the temporary plug and compared it to the standard drain plug which was replaced. The stark differences between the two plugs are nowhere described and compared in the majority opinion. Examination of these two simple screw devices does not require rocket science. The factory equipped drain plug is a 1/2-inch heavy steel bolt that is screwed into the hole in the oil pan. If the threads on the 1/2-inch bolt or in the oil pan hole are stripped or worn, the bolt will not tighten securely to hold the bolt in place and prevent an oil leak. Although the Sepulvados reported no problem with leaking oil prior to the oil change, the problem of a stripped or worn drain plug was identified by Time-It while working on the vehicle.[1] This problem caused Time-It's technician to employ the temporary drain plug device.
An exemplar of the temporary drain plug device is in the evidence as part of plaintiff's Exhibit 2. From my review of this simple mechanical device, it exhibits some inherent weaknesses. On one end of the device is a metal cap approximately 1 1/4 inches in diameter with a rubber seal of approximately the same size affixed inside the cap. Extending out of the cap and rubber seal is a long threaded bolt approximately 3/16 inches in diameter. The 3/16-inch bolt is screwed into a small, 1 1/2-inch long brace or "backing plate" that can be turned sideways on the bolt to allow the bolt and backing plate to be inserted into the 1/2-inch hole in the oil pan. The feature which allows the backing plate to turn results because a small nut is attached to the backing plate by tiny, metal pins instead of being welded in place with the backing plate. The temporary plug is then secured by tightening the 3/16-inch bolt into the nut and the backing plate is pulled down as a brace against the inside wall of the oil pan.
When Englade first examined the oil pan after the engine was damaged, the oil *735 pan hole was open. The temporary cap, rubber plug and 3/16-inch bolt were missing. Only a portion of the backing plate for the temporary device was still inside the oil pan. Englade identified at trial the actual piece of the backing plate which he found inside the oil pan. It is in the record. When what remained of the actual backing plate is compared to the exemplar, the small nut pinned to the backing plate on the exemplar is revealed to be missing from the actual backing plate found in the car's oil pan. Thus, upon the rock hitting the temporary plug as hypothesized by the majority, there was a failure of the thin, sheet metal backing plate at its attachment to the nut. Such failure caused the 3/16-inch bolt, the nut and the plug/rubber cap to fall out of the grip created between the backing plate and the oil pan.
On the day the engine failed on the interstate highway, Mr. Sepulvado testified that he did not observe an oil light warning on the vehicle. There was no evidence to suggest that the Sepulvados observed any signs of oil leakage as they drove the car. This evidence indicates a sudden loss of the engine oil which corroborates the failure of the attachment of the nut to the backing plate, clearly seen by examining the exemplar of the device and remaining portion of the backing plate.
The contrast in the structural integrity between the standard and permanent heavy 1/2-inch steel plug and the stop-gap and flimsy sheet metal device is marked. The random rock event hypothesized by the majority could not have dislodged a permanent heavy steel oil plug tightened into the equally heavy steel of the oil pan. The majority view, however, rests entirely on the conclusion that such a rock probably dislodged and destroyed the temporary plug causing the tiny sheet metal plug to fail with the admitted sudden loss of the oil. The majority's reasoning therefore proves the theory of the plaintiff's case. If the plaintiff could rely on the structural integrity of the heavy steel plug to serve the vehicle between numerous oil changes regardless of any barrage from highway rocks under the vehicle, was she not entitled to rely on that same degree of fitness between oil changes for the temporary plug as represented by Time-It? If not, the limited reliability of the temporary plug, that could have been destroyed by a highway rock on Mrs. Sepulvado's drive home from Time-It Lube, should have been explained to her in the form of a warning which she states was never given. Accordingly, I respectfully submit that the plaintiff's undisputed evidence established a breach of the warranty of fitness and the case should be remanded for presentation of the defense.
APPLICATION FOR REHEARING
Before WILLIAMS, STEWART, CARAWAY, PEATROSS, and DREW, JJ.
Rehearing denied.
CARAWAY, J., would grant rehearing.
NOTES
[1] There is no evidence of a prior oil leak from the plug. Therefore, circumstantially, Time-It's work in tightening the plug may have stripped the threads. Although this is not the basis of plaintiff's claim, the inference weighs in favor of the plaintiff's position concerning the lack of a proper explanation of the problem and the need for immediate repair.